UNPUBLISHED

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-7605

WARREN CUTHA HESTER, II,

Petitioner - Appellant,

v.

DAVID BALLARD, Warden, Mt. Olive Correctional Complex,

Respondent - Appellee.

Appeal from the United States District Court for the Southern District of West Virginia, at Beckley. Irene C. Burger, District Judge. (5:13-cv-21007)

Argued: December 6, 2016                    Decided: February 14, 2017

Before NIEMEYER, DUNCAN, and WYNN, Circuit Judges.

Affirmed by unpublished opinion. Judge Wynn wrote the opinion, in which Judge Niemeyer and Judge Duncan joined.

**ARGUED**: Michael Allen McIntosh, Washington, D.C., for Appellant. Gilbert Charles Dickey, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellee. **ON BRIEF**: Patrick Morrisey, Attorney General, Elbert Lin, Solicitor General, Shannon Frederick Kiser, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WEST VIRGINIA, Charleston, West Virginia, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

WYNN, Circuit Judge:

Petitioner Warren Hester seeks federal habeas relief from his convictions of sexual assault, battery, brandishing a deadly weapon, kidnapping, and nighttime burglary after a trial in the Circuit Court of Raleigh County, West Virginia. During state post-conviction proceedings, Petitioner claimed that the state trial court committed numerous constitutional errors. After conducting two evidentiary hearings, West Virginia courts denied Petitioner post-conviction relief.

Upon considering Petitioner's subsequent appeal for federal habeas relief under 28 U.S.C. § 2254, the United States District Court for the Southern District of West Virginia denied his petition. We granted a certificate of appealability as to three of Petitioner's claims of constitutional error. Because Petitioner has not proven that the state habeas court's denial of his petition was contrary to or involved an unreasonable application of clearly established federal law, we affirm the district court's denial of his petition.

I.

A.

Petitioner's challenged convictions arose from his 2005 sexual assault of an 11-year-old girl (hereinafter referred to as "M") in Beckley, West Virginia. At trial, M testified that, on the night of January 20, 2005, she was home with her younger siblings while her mother worked the night shift at a local convenience store. That evening, Petitioner came to M's home and told M that he had her mother's permission to wait there until her mother returned from work the following morning. M allowed Petitioner to enter the home. Later that night, M fell asleep on the couch in the living room while

watching a movie. While M was asleep, Petitioner attempted to remove her sock, but he ceased his attempt when M awoke. Later, Petitioner went into the kitchen and called for M's assistance in finding a light switch. When M entered the kitchen, Petitioner asked M if he could suck her toes. M replied "no" and attempted to leave the kitchen, but Petitioner grabbed her from behind and put a steak knife to her face, leaving two small cuts on her mouth. Petitioner then led M upstairs, forced her to remove her clothes, and sexually assaulted her in two different rooms by kissing her, sucking her toes, subjecting her to oral sex, and forcing her to perform oral sex on Petitioner.

After these assaults, Petitioner allowed M to dress and return downstairs. Later that night, however, Petitioner forced M to sit on his lap while he again sucked her toes. Petitioner left M's home ten minutes before her mother returned from work. When her mother returned, M told her mother about the assaults and identified Petitioner as her assailant. M's mother reported the assaults to law enforcement soon thereafter. Police officers arrested Petitioner in connection with the assaults later that day.

B.

On May 9, 2005, a grand jury indicted Petitioner for first degree sexual assault, battery, brandishing a deadly weapon, kidnapping, and nighttime burglary. Before and during trial, Petitioner unsuccessfully made motions to: (1) bar the prosecution from introducing evidence of two out-of-state offenses Petitioner committed as a juvenile, including (a) evidence that Petitioner, at the age of 15, broke into an Ohio woman's home, accosted the woman at knifepoint, attempted to remove her clothes, and sucked her toes and (b) evidence that Petitioner, also at the age of 15, entered a Washington, D.C.

4

woman's apartment, pointed a gun at her, sucked her toes, and sexually assaulted her twice; (2) admit evidence of seminal fluid found in one of the rooms in which Petitioner assaulted M that, based on DNA testing, belonged to an unknown third party and not to Petitioner; and (3) allow Petitioner's trial counsel to withdraw due to two alleged conflicts of interest.

Petitioner's case proceeded to trial before a jury. On January 11, 2006, the jury found Petitioner guilty of two counts of first degree sexual assault and one count each of battery, brandishing a deadly weapon, kidnapping, and nighttime burglary. The court subsequently sentenced Petitioner to life imprisonment without the possibility of parole for the kidnapping conviction and imposed additional, consecutive terms of imprisonment of varying lengths for each of Petitioner's other convictions.[1]

On August 29, 2007, Petitioner filed a petition for appeal of his convictions and sentence in the Supreme Court of Appeals of West Virginia. The Supreme Court of Appeals refused the petition on May 22, 2008. Petitioner then challenged his convictions and sentence through West Virginia's post-conviction proceedings, filing a petition for writ of habeas corpus pursuant to W. Va. Code § 53-4A-1 in the Circuit Court of Raleigh County (the "state habeas court") and asserting that myriad constitutional errors tainted

---

[1] The court sentenced Petitioner to one term of 15 to 35 years in prison for each of the two counts of sexual assault; a term of 6 months for the battery conviction; a term of 1 year for the brandishing conviction; and a term of 1 to 15 years for the nighttime burglary conviction. Petitioner's sentences for sexual assault, battery, brandishing, and nighttime burglary were to run consecutively both to one another and to Petitioner's life-sentence for kidnapping.

his trial and convictions. On March 2, 2012, after conducting two evidentiary hearings, the state habeas court entered a 99-page "Omnibus Habeas Corpus Final Judgment Order" denying Petitioner's claims for relief.[2] Petitioner appealed the state habeas court's denial of his petition to the Supreme Court of Appeals of West Virginia, which adopted the state habeas court's findings and conclusions and summarily affirmed its denial of habeas relief.

Thereafter, Petitioner initiated this petition for federal habeas review under 28 U.S.C. § 2254 in the United States District Court for the Southern District of West Virginia, alleging seven separate grounds for relief. Respondent moved for summary judgment. A United States Magistrate Judge entered proposed findings and recommended that the district court grant Respondent's motion for summary judgment and dismiss Petitioner's Section 2254 petition. The district court adopted the magistrate's findings and recommendation, awarding summary judgment in favor of Respondent and dismissing the petition.

We granted a certificate of appealability on three issues: (1) whether the trial court's admission of evidence related to Petitioner's out-of-state juvenile convictions violated his rights under the Full Faith and Credit Clause, Equal Protection Clause, and Due Process Clause; (2) whether the trial court's exclusion of the seminal fluid evidence

---

[2] Because Petitioner did not waive any potential grounds for habeas relief, the state habeas court addressed and disposed of "all the possible contentions and prominent grounds [for relief] envisaged in" *Losh v. McKenzie*, 277 S.E.2d 606 (W. Va. 1981)—a West Virginia case that purports to outline all potential bases for state habeas relief—as well as Petitioner's enumerated claims.

violated the Due Process Clause; and (3) whether the trial court's denial of trial counsel's motion to withdraw based on two allegedly disabling conflicts of interest violated Petitioner's Sixth Amendment right to effective assistance of counsel. After thorough consideration, we affirm the district court's denial of Petitioner's Section 2254 petition.

## II.

"We review the district court's denial of a habeas petition *de novo*," *Grueninger v. Dir., Va. Dep't of Corr.*, 813 F.3d 517, 523 (4th Cir. 2016), but "[t]he Antiterrorism and Effective Death Penalty Act of 1996 ('AEDPA'), which accords deference to final judgments of state courts, circumscribes our review," *LeBlanc v. Mathena*, 841 F.3d 256, 263 (4th Cir. 2016). Under AEDPA, we may grant habeas relief to a state prisoner, like Petitioner, only when the Petitioner's state court adjudication (1) "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2) "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

A state court's decision is "contrary to . . . clearly established precedent if the state court applies a rule that contradicts the governing law set forth" in Supreme Court holdings or "confronts facts that are materially indistinguishable from a relevant Supreme Court precedent and arrives at [the opposite] result." *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state court's decision involves an "unreasonable application" of clearly established federal law when it states the "correct governing legal principle . . . but

7

unreasonably applies that principle to the facts" of the case. *Id.* at 413. To warrant reversal, the state court's application must be "objectively unreasonable." *Id.* at 409.

"In assessing a state prisoner's habeas claims, we review the 'last reasoned' state court decision." *LeBlanc*, 841 F.3d at 263–64 (citing *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991)). In other words, "[w]hen a state appellate court summarily affirms a reasoned lower-court decision, . . . a federal habeas court is to 'look through' the unexplained affirmance to examine the 'last reasoned decision' on the claim, assuming that the summary appellate decision rests on the same ground." *Grueninger*, 813 F.3d at 525–26 (citing *Ylst*, 501 U.S. at 803–04). Here, the parties agree that the state habeas court's 99-page order denying Petitioner habeas relief was the "last reasoned [state court] decision." *Id.* at 526. Accordingly, "the state-court decision that we review for 'objective reasonableness'" is that of the state habeas court. *Id.* at 525.

### III.

First, we address Petitioner's claims that the trial court's admission of evidence regarding his prior juvenile dispositions for sexual assault violated his rights under the Full Faith and Credit Clause, U.S. Const. art. IV, § 1, Equal Protection Clause, *id.* amend. XIV, § 1, and Due Process Clause of the United States Constitution, *id.* amend. V.

### A.

We turn initially to Petitioner's claim that the trial court's admission of testimony and records relating to his prior juvenile dispositions in Ohio and Washington, D.C.—when Ohio and Washington, D.C. statutes deem such records confidential and prohibit their use in future criminal proceedings in the states' courts—violated the Full Faith and

8

Credit Clause.  Neither the state habeas court nor the Supreme Court of Appeals of West Virginia expressly addressed this claim, prompting disagreement between the parties as to whether we review the claim *de novo* or through the lens of AEDPA deference.  *See Grueninger*, 813 F.3d at 526 ("Deference under 28 U.S.C. § 2254(d) . . . extend[s] only to the points actually determined by the state trial court in its reasoned decision; the *Richter* rule requiring deference to 'hypothetical reasons [a] state court might have given for rejecting [a] federal claim' is limited to cases in which no state court has issued an opinion giving reasons for the denial of relief." (third and fourth alterations in original) (quoting *Brumfield v. Cain*, 135 S. Ct. 2269, 2282–83 (2015))).  Because Petitioner's claim fails under the less deferential *de novo* standard of review, we need not—and thus do not—decide whether AEDPA deference applies in such circumstances.

Article IV, Section 1 of the Constitution provides that "Full Faith and Credit shall be given in each State to the public Acts, Records, and judicial Proceedings of every other State."  U.S. Const. art. IV, § 1.  Statutes—like the Ohio and Washington, D.C. juvenile records statutes—are "'public act[s]' within the meaning of the Full Faith and Credit Clause."  *Carroll v. Lanza*, 349 U.S. 408, 411 (1955).  The Clause "does not compel a state to substitute the statutes of other states for its own statutes dealing with a subject matter concerning which it is competent to legislate."  *Franchise Tax Bd. of Cal. v. Hyatt*, 538 U.S. 488, 494 (2003) (internal quotation marks omitted).  Rather, a state may apply its own law in the face of another state's conflicting statute as long as its choice of law is "neither arbitrary nor fundamentally unfair" and does not evince a

9

"policy of hostility to the public Acts of a sister State." *Id.* at 494–95, 499 (internal quotation marks omitted).

Petitioner argues that, by admitting records of his out-of-state juvenile dispositions and allowing in-court testimony by the victims of those offenses that was derivative of the records, the trial court applied a "special rule of law" and "policy of hostility" that was inconsistent with West Virginia's own policy of maintaining the confidentiality of juvenile records, as well as hostile to the Ohio and Washington, D.C. juvenile records statutes. Petitioner conceded at oral argument that his Full Faith and Credit Clause claim is limited to the trial court's admission of his juvenile *records* and in-court witness testimony *derivative of* those records. Accordingly, Petitioner does not assert that admission of the Ohio and Washington, D.C. victims' testimony regarding their own recollections of Petitioner's assaults against them or their in-court identifications of Petitioner as their assailant implicates the Full Faith and Credit Clause.

"[H]abeas petitioners are not entitled to habeas relief based on trial error unless they can establish that it resulted in actual prejudice." *Davis v. Ayala*, 135 S. Ct. 2187, 2197 (2015) (internal quotation marks omitted) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)). Put differently, habeas "relief is proper only if the federal court has grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict." *Id.* at 2197–98 (internal quotation marks omitted) (quoting *O'Neal v. McAninch*, 513 U.S. 432, 436 (1995)).

Petitioner raises no constitutional challenge to the trial court's admission of the Ohio and Washington, D.C. victims' testimony regarding their recollections of the sexual

10

assaults committed against them and their in-court identifications of Petitioner as their assailant. Therefore, regardless of whether the trial court properly admitted Petitioner's juvenile records and testimony derivative of those records, such evidence was cumulative of the victims' concededly admissible testimony regarding Petitioner's prior sexual assaults and modus operandi of sucking his victims' toes during such assaults. Because the substance of the challenged records and testimony was properly before the jury, we conclude that Petitioner cannot establish that any constitutional violation resulting from the trial court's decision not to exclude Petitioner's juvenile records and in-court witness testimony derivative of those records "resulted in actual prejudice" by having a "substantial and injurious effect or influence" on the jury's verdict. *Id.* Accordingly, Petitioner is not entitled to relief under the Full Faith and Credit Clause.

## B.

We next consider Petitioner's assertion that the confidentiality provisions of the West Virginia Child Welfare Act (the "Child Welfare Act")—specifically, W. Va. Code §§ 49-5-103, 49-5-101(a), and 49-4-103—violate the Equal Protection Clause.[3] Again, we decline to resolve the parties' dispute as to whether AEDPA deference applies because Petitioner's equal protection argument fails even under *de novo* review. *See supra* Part III.A.

---

[3] These West Virginia statutes were formerly cited as W. Va. Code §§ 49-5-17, 49-7-1, and 49-7-3, respectively.

11

The relevant provisions of the Child Welfare Act deem *records* of West Virginia juvenile proceedings confidential and prohibit use of those records in future criminal proceedings. W. Va. Code § 49-5-101 ("Except as otherwise provided in this chapter or by order of the court, all *records* . . . concerning a child or juvenile which are maintained by [certain state agencies] are confidential[.]" (emphasis added)); *id.* § 49-5-103(b) ("*Records* of a juvenile proceeding conducted under this chapter . . . shall not be disclosed to anyone unless disclosure is otherwise authorized[.]" (emphasis added)); *see also Hester v. West Virginia*, Civ. Action No. 5:07-cv-00401, 2008 WL 4298471, at *4 (S.D. W. Va. Sept. 18, 2008) (holding that the Child Welfare Act deems confidential only records of those juvenile proceedings conducted in West Virginia pursuant to West Virginia's juvenile statutes). Another provision prohibits using "evidence given in any cause or proceeding under this chapter, or any order, judgment or finding therein, or any adjudication upon the status of juvenile delinquent . . . in any civil, criminal or other cause or proceeding" as evidence against the child. W. Va. Code § 49-4-103. West Virginia courts have interpreted these statutory provisions as requiring exclusion of testimony that derives from juvenile records, in addition to barring use of the records themselves, in future criminal proceedings. *State v. Van Isler*, 283 S.E.2d 836, 838 (W. Va. 1981) (holding that the use of evidence in a juvenile record as well as "testimony derived from" that record may not be introduced as evidence in future criminal proceedings during the prosecution's case in chief).

Petitioner does not argue that the challenged confidentiality provisions of the Child Welfare Act encompass a victim's in-court testimony in future criminal

12

proceedings that is not derivative of a defendant's juvenile records but, instead, recounts the victim's own recollection of the juvenile offense. Therefore, we address Petitioner's equal protection claim only as it relates to the Child Welfare Act's prohibition on the use of in-state juvenile records and testimony derived from those records in future criminal proceedings. Accordingly, we must decide whether West Virginia's decision to prohibit the use of West Virginia juvenile records in future criminal proceedings while allowing the use of out-of-state juvenile records in such proceedings complies with the Equal Protection Clause.

"Under an Equal Protection analysis, courts generally hold that 'legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest.'" *Giarratano v. Johnson*, 521 F.3d 298, 302–03 (4th Cir. 2008) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)). Under the rational basis test—which the parties agree applies in this case— legislation that treats similarly situated individuals differently "will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Cleburne Living Ctr.*, 473 U.S. at 440. To establish that disparate treatment fails the rational basis test, "the plaintiff bears the burden 'to negate every conceivable basis which might support' the legislation." *Giarratano*, 521 F.3d at 303 (quoting *Lehnhausen v. Lake Shore Auto Parts Co.*, 410 U.S. 356, 364 (1973)). And "the State has no obligation to produce evidence to support the rationality of the statute, which 'may be based on rational speculation unsupported by any evidence or empirical data.'" *Id.*

(quoting *FCC v. Beach Commc'ns, Inc.*, 508 U.S 307, 315 (1993)). Under this highly deferential test, we conclude that Petitioner's equal protection argument lacks merit.

There are rational reasons why West Virginia may have chosen to prohibit the use of records arising from West Virginia juvenile proceedings and testimony derived from those records in future criminal proceedings while simultaneously allowing records from juvenile proceedings in other states to be offered as evidence in future West Virginia criminal proceedings. For instance, while West Virginia statutes and courts dictate when a juvenile offender can—or must—be prosecuted as an adult for a particular offense, West Virginia cannot control whether other states adjudicate a juvenile offender as an adult in the same circumstances. *E.g.*, W. Va. Code § 49-4-710 (providing for various scenarios in which a court may or must transfer a juvenile proceeding to the court's criminal jurisdiction). Therefore, West Virginia has a legitimate interest in admitting as evidence an adult offender's out-of-state juvenile record when the same offense, had it been committed in West Virginia, would have been handled in the adult criminal system and, thus, not barred from use in a future criminal proceeding by the Child Welfare Act's confidentiality provisions. Because there is one "conceivable basis which might support" the distinction drawn by the Child Welfare Act's confidentiality provisions, *Lehnhausen*, 410 U.S. at 364, Petitioner's equal protection claim fails.

Even if the Child Welfare Act's confidentiality provisions lacked a rational basis, Petitioner's equal protection challenge still would fail. As discussed, *supra* Part III.A, a constitutional error at trial must give rise to "grave doubt about whether [the error] had substantial and injurious effect or influence in determining the jury's verdict" for that

14

error to serve as a basis for habeas relief. *Davis*, 135 S. Ct. at 2198 (internal quotation marks omitted). Because Petitioner's equal protection challenge does not extend to the district court's admission of the Ohio and Washington, D.C. victims' in-court testimony regarding their recollections of the sexual assaults Petitioner committed against them, admission of the records of Petitioner's juvenile offenses and of testimony derived from those records—which was cumulative of the victims' concededly admissible testimony—did not substantially influence the jury's verdict.

C.

We now turn to Petitioner's final constitutional claim arising from the trial court's admission of testimony and records related to his juvenile offenses—whether the state habeas court's determination that admission of this evidence did not violate Petitioner's rights under the Due Process Clause was "contrary to, or involved an unreasonable application of, clearly established Federal law."[4] 28 U.S.C. § 2254(d)(1).

"Only when evidence 'is so extremely unfair that its admission violates fundamental conceptions of justice' ha[s the Supreme Court] imposed a constraint tied to the Due Process Clause." *Perry v. New Hampshire*, 132 S. Ct. 716, 723 (2012) (citation omitted) (quoting *Dowling v. United States*, 493 U.S. 342, 352 (1990)); *see also Ward v. Johnson*, 690 F.2d 1098, 1109 (4th Cir. 1982) (en banc) ("Errors in the admission or exclusion of evidence in a state criminal trial rise[] to the level of a constitutional deprivation *only* if the error is of such magnitude as to deny fundamental fairness."). The

---

[4] The parties agree that AEDPA deference applies to this claim.

15

trial court's admission of evidence and testimony establishing Petitioner's prior sexual assaults undoubtedly was prejudicial, as is all incriminating evidence. *See United States v. Boyd*, 53 F.3d 631, 637 (4th Cir. 1995) ("[I]n one sense all incriminating evidence is inherently prejudicial."). But evidence of Petitioner's prior bad acts, as testified to by the Ohio and Washington, D.C. victims, was also highly probative of whether Petitioner committed the sexual assault against M, principally due to the common characteristics all three assaults shared—Petitioner's attacking his victims from behind and sucking their toes.

Had Petitioner's case been adjudicated in federal court, such evidence would have been admissible under the Federal Rules of Evidence as relevant to his "intent, . . . plan, . . . [and] identity." Fed. R. Evid. 404(b). Because admission of Petitioner's prior sexual assault offenses did not violate this Federal Rule of Evidence, we cannot say that the state habeas court's determination that their admission under an analogous, state evidentiary rule did not render Petitioner's trial fundamentally unfair was contrary to or involved an unreasonable application of clearly established federal law. *Cf. Perry*, 132 S. Ct. at 723 ("The Constitution, our decisions indicate, protects a defendant against a conviction based on evidence of questionable reliability, not by prohibiting introduction of the evidence, but by affording the defendant means to persuade the jury that the evidence should be discounted . . . . [S]tate and federal statutes and rules ordinarily govern the admissibility of evidence, and juries are assigned the task of determining the reliability of the evidence presented at trial."). Accordingly, we decline to grant habeas review on this basis.

16

IV.

Having determined that Petitioner's claims regarding admission of testimony and records relating to his juvenile offenses do not warrant habeas relief, we now consider whether the state habeas court's determination that the trial court's exclusion of the third-party seminal fluid found in one of the rooms in which Petitioner assaulted M did not violate Petitioner's right to due process was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

Petitioner asserts that the trial court's exclusion of the seminal fluid evidence prevented him from mounting a defense based on third-party guilt, violating his right under the Due Process Clause to present a meaningful defense. In particular, Petitioner contends that the trial court's exclusion of the seminal fluid evidence was an unreasonable application of the Supreme Court's holding in *Holmes v. South Carolina*, 547 U.S. 319 (2006). In *Holmes*, the Supreme Court held that a trial court may not exclude a defendant's evidence of third-party guilt based on an assumption that "the prosecution's evidence, *if credited*, would provide strong support for a guilty verdict." 547 U.S. at 330. In other words, the *Holmes* Court prohibited trial courts from excluding evidence of third-party guilt based solely on the strength of the prosecution's evidence.

But the *Holmes* Court specifically disclaimed any notion that its prohibition on allowing the strength of the prosecution's evidence to govern the admissibility of evidence of third-party guilt rendered unconstitutional every rule "regulating the admission of evidence proffered by criminal defendants to show that someone else committed the crime with which they are charged." *Id.* at 327. According to the Court,

17

many of these rules remain "widely accepted" and are not affected by the outcome in *Holmes*. *Id.* Notably for purposes of this case, one of the "widely accepted" evidentiary rules cited favorably by the *Holmes* Court and left untouched by the principle announced in *Holmes* was the rule in *State v. Parr*, 534 S.E.2d 23 (W. Va. 2000) (per curiam). *Id.* at 327 n.*.

In *Parr*, the Supreme Court of Appeals of West Virginia reiterated West Virginia's rule that "the admissibility of testimony implicating another person as having committed a crime hinges on a determination of whether the testimony tends to directly link such person to the crime, or whether it is instead purely speculative." 534 S.E.2d at 29 (quoting *State v. Harman*, 270 S.E.2d 146, 150 (1980)). The "direct link" rule—cited favorably and left untouched by *Holmes*—was the same rule that the trial court applied to prohibit Petitioner from introducing the seminal fluid evidence, which Petitioner could not link to any particular third party and could only speculate may have belonged to Derrick Mickles, the boyfriend of M's mother. Such evidence tends to suggest "merely that another person had a motive or opportunity" to commit the crime and, thus, is inadmissible under West Virginia law. *Harman*, 270 S.E.2d at 150. Because *Holmes* cited *Parr* favorably and did not call into question the "direct link" rule's constitutionality, the state habeas court's approval of the exclusion of the seminal fluid evidence was not "an unreasonable application of" *Holmes*. 28 U.S.C. § 2254(d)(1).

## V.

Finally, we examine Petitioner's Sixth Amendment claims. In particular, we consider whether the state habeas court's determination that the existence of two,

18

allegedly disabling conflicts of interest did not deprive Petitioner of his Sixth Amendment right to effective assistance of counsel was "contrary to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

"A criminal defendant's Sixth Amendment right to effective assistance of counsel includes a right to counsel unhindered by conflicts of interest." *Mickens v. Taylor*, 240 F.3d 348, 355 (4th Cir. 2001) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 345–50 (1980)). Although a petitioner alleging ineffective assistance of counsel ordinarily must establish both (1) that his counsel's representation was deficient and (2) "that the deficient performance prejudiced the defense," *Strickland v. Washington*, 466 U.S. 668, 687 (1984), the standard is different when a petitioner's ineffective assistance claim is premised on counsel's conflict of interest. "To establish ineffective assistance of counsel on conflict of interest grounds, a petitioner must establish that (1) his attorney labored under 'an actual conflict of interest' that (2) 'adversely affected his lawyer's performance.'" *Mickens*, 240 F.3d at 355 (quoting *Sullivan*, 446 U.S. at 348). If a petitioner satisfies both prongs of this test, "prejudice is presumed." *Id.*

Petitioner first asserts that his trial counsel's prior, unrelated representation of Derrick Mickles prevented trial counsel from pointing to Mickles as an alternate perpetrator of the sexual assaults committed against M. The Supreme Court's precedent regarding Sixth Amendment conflict-of-interest claims contemplates an "*actual* conflict of interest." *Sullivan*, 446 U.S. at 348 (emphasis added). The mere "*possibility* of conflict is insufficient to impugn a criminal conviction." *Id.* at 350 (emphasis added).

19

Here, trial counsel was not currently representing Mickles when he represented Petitioner, and trial counsel's prior representation of Mickles did not relate to Petitioner's case. Additionally, Mickles was not "directly link[ed] . . . to the crime" by any piece of evidence. *Harman*, 270 S.E.2d at 150. In such circumstances, we cannot say that the state habeas court's determination that trial counsel's prior representation of Mickles did not rise to the level of an "actual conflict of interest" was contrary to or an unreasonable application of clearly established federal law.

Second, Petitioner claims that his trial counsel's prior representation of Lisa Hartman, a prosecution witness, crippled trial counsel's ability to effectively cross-examine and impeach Hartman. The state habeas court's conclusion that trial counsel's prior representation of Hartman was not an "actual conflict of interest" and, thus, that Petitioner failed to meet the first prong of the *Sullivan* test was not an unreasonable application of clearly established law. To the contrary, the record demonstrates that Hartman—with advice from independent, court-appointed counsel—knowingly and voluntarily waived any conflict, along with her attorney-client privilege, for the purpose of allowing Petitioner's trial counsel to cross-examine her effectively, including by impeaching her credibility. Any "actual conflict of interest" that may have existed due to trial counsel's prior, unrelated representation of Hartman was rendered null by Hartman's knowing and voluntary waiver of the conflict and of her attorney-client privilege, and the state habeas court's conclusion was, accordingly, not an unreasonable application of clearly established law.

Moreover, the state habeas court's determination that any "actual conflict of interest" created by trial counsel's prior representation of Hartman did not adversely affect Petitioner's representation at trial also was not contrary to or an unreasonable application of clearly established federal law. As the state habeas court correctly noted, Petitioner's trial counsel "zealously cross-examined Ms. Hartman at trial, eliciting testimony that she was a severe alcoholic and binge drinker" and drawing out inconsistencies in her testimony. J.A. 70. Based on this evidence, it was not contrary to, or an unreasonable application of, clearly established federal law to hold that trial counsel's representation of Petitioner was not affected negatively by any actual conflict of interest that existed.

## VI.

For the foregoing reasons, we affirm the district court's order dismissing Petitioner's Section 2254 petition for habeas relief.

*AFFIRMED*